THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* CHARLES E. PRESLEY, Appellant.

Fourth Department, December 3, 1964.

152

*Asher S. Cohen* for appellant.

*Francis R. Moran, District Attorney (Lucien Ali* of counsel), for respondent.

DEL VECCHIO, J. The question as to the defendant's guilt or innocence was clearly one of fact for the jury and the verdict finding him guilty should be upheld unless errors of a substantial and prejudicial character were committed during the trial. We have reviewed the record and in our judgment the defendant received a fair trial and his guilt of the crimes of robbery, first degree, and grand larceny, second degree, as charged in the indictment, was established beyond a reasonable doubt without substantial error.

The dissenting Justices vote for reversal on the ground that defendant did not have a fair trial, and advance three grounds. In light of the reasons stated, we desire to point out the following: (1) The District Attorney, as a means of securing an impartial jury, was entitled to 20 peremptory challenges for which no reason need be given. (Code Crim. Pro., §§ 372, 373.) The defendant was a Negro and, although the reason for asking whether any juror had been '' active either directly or indirectly with the so-called Congress on Racial Equality, which is also known as CORE '' does not appear in the record, we may not speculate as to what was in the District Attorney's file or what was in his mind. He was fully justified in asking the question to ascertain whether there were prejudices or opinions that would influence judgment. Furthermore, based upon instinct and experience he may have concluded not to accept as a juror one who was connected with CORE activities even though he could not be excused for cause.

There is authority that bias on account of race is a basis for disqualification of a juror (*People* v. *Leonti,* 262 N. Y. 256) and that questions may be propounded on *voir dire* for the purpose of determining whether to exercise a peremptory challenge. (*Dresch* v. *Elliott,* 137 App. Div. 252.) The privilege extends to questions concerning membership in organizations involved with race relations. (*Smith* v. *United States,* 262 F. 2d 50.) '' The prosecution and the defense were both entitled to a trial by fair, impartial and unbiased jurors * * *. In order to ascertain whether a juror is prejudiced in a particular case it has always been held proper to inquire as to his membership in any political, religious, social, industrial, fraternal, law-enforcement or other organization whose beliefs or teaching would prejudice him for or against either party to that case.'' (*People* v. *Buyle,* 22 Cal. App. 2d 143, 145–146.) Moreover, in view of the court's suggestion that the District Attorney proceed along another line, the subject of CORE activity was not pursued beyond the single question addressed to the panel.

Our decision in *People* v. *Burney* (20 A D 2d 617), relied upon in the dissent, has no application. In that case there was a deliberate, unnecessary and unwarranted injection of the racial issue. Here the reference to CORE was to obtain information as to the suitability and acceptability of jurors. There is no reason to impute an improper, unfair or unethical motive to the District Attorney where one does not appear in the record.

(2) In our opinion it was not improper to bring out on direct examination matters concerning the execution of waivers of immunity which the prosecutor felt should be called to the jury's attention in evaluating the testimony of accomplices he was to call as witnesses. In any event, there was no objection to the procedure followed by the District Attorney. When the prosecutor announced that he was going to bring the accomplices in the courtroom and put them on the stand '' on the proposition of immunity '' and asked whether there was any objection, defendant's counsel responded, '' No ''.

(3) The most important question for consideration is whether the period of deliberation had any effect upon the verdict. The trial had lasted seven days; the case was submitted to the jury at 5:20 P.M. and the verdict was returned at 3:47 A.M. However, of the intervening time, nearly four hours were consumed by dinner and the reading of certain testimony, leaving a little over six hours for deliberation. At 12:35 A.M. the jury addressed a note to the court: '' At this point of deliberation, after several ballots and an individual polling of the members of the Jury we have reached a deadlock position. *Could you at this time give*

*us advice as to the procedure that we should follow.*" (Emphasis supplied.) The court returned the jury to the courtroom, advised them that after a six- or seven-day trial it " is always difficult at this point to feel that we are up against an impasse as you have indicated ", and inquired whether there was anything further the court could do that would be of assistance to the jury. The foreman then said: " Would you explain to us at what point we would be at an impasse, what is the law at this point? " The court stated that if it were satisfied that it was impossible for the jury to reach a verdict then it could grant a mistrial, but that because of the length of the trial " we of course would like to have you arrive at a verdict if you think a little more time at deliberating would bring about a verdict, or if there is anything the Court could explain to you in connection with this case, that's what we want to do." The foreman immediately said: " Could you again, I'm told by one of the jurors, they've requested that you explain to us about reasonable doubt." Shortly thereafter, the jury requested the rereading of some important testimony. At 1:30 A.M. the jury was again returned to the courtroom and 50 minutes were consumed in the rereading of the testimony requested, then the jury retired for further deliberation, free to convict, acquit or disagree. At 3:47 A.M. they agreed upon a verdict of guilty as charged in the indictment.

It is well established that the determination of how long a disagreeing jury will be kept together and required to continue their deliberation is a matter of sound judicial discretion which, in the absence of abuse, will not be disturbed. There are cases where juries deliberated for considerably longer periods than did this jury and had been returned to the jury room even after announcing they were " hopelessly deadlocked " or intimated they would be unable to agree, yet verdicts subsequently arrived at were not overturned. (*People v. Campanaro,* 223 App. Div. 248, affd. 249 N. Y. 545; *People v. Koerner,* 117 App. Div. 40, affd. 191 N. Y. 528.)

It is important that in the present case the jury never asked to be discharged, never said they were tired and needed rest, never stated that an agreement would be impossible even after further deliberation or even that they were not likely to agree. On the contrary, as evidence that they had not yet abandoned their task, they asked the court for advice, for further instruction on the law and for the rereading of certain testimony. Furthermore, the court never instructed the jurors that they were required to reach a verdict.

In the circumstances presented by the record, we cannot conclude that the verdict was not fairly reached, nor do we think that any of the incidents upon which our dissenting brethren rely, either singly or cumulatively, resulted in a denial of a fair trial to the defendant. Accordingly, the conviction should be affirmed.

GOLDMAN and NOONAN, JJ. (dissenting). We are constrained to vote for reversal of the conviction and to grant a new trial because in several respects the elements of a fair trial were absent. From the very beginning of the trial, indeed as prospective jurors were being examined, the District Attorney inquired as to whether any of them had any interest in or were active in an organization named " Congress of Racial Equality " which is commonly known as " CORE ". There was no basis whatsoever for this inquiry and reference to this completely unrelated subject could, under the circumstances of the trial of this Negro, only serve to prejudice and confuse the jury. " The effect of his injection of race and color into the case was unwarranted and improper." (*People* v. *Burney*, 20 A D 2d 617.) During the course of the trial the four alleged accomplices of the defendant, whose trials had been severed and were to be tried separately, were dramatically brought into court in the presence of the jury and required to execute waivers of immunity while on the witness stand. Thereafter each of them testified for the People. Aside from the inculpating testimony of these four accomplices there was only one witness, Chillemi, who made positive identification of the defendant from seeing his facial characteristics. The victim was unable to identify him at all. The difficulty which the jury had in resolving the question of identity was obvious from the questions they asked and the testimony which they requested to be read to them on two occasions after they had retired to deliberate. This fact, coupled with the testimony of the three alibi witnesses produced by defendant, and the failure to find any of the fruits of the crime on defendant's person, although he was accused of taking $236 in currency and was apprehended 20 minutes after commission of the crime, do not present the quality of proof required to establish guilt beyond a reasonable doubt.

At 12:35 in the morning, more than seven hours after they had commenced their deliberations, the jury sent a communication to the court which stated: " At this point of deliberation, after several ballots and an individual polling of members of the Jury we have reached a deadlock position." Defense counsel

moved for a mistrial, which was denied. The court requested the jury to continue their deliberations "because of the length of time it has taken to try this case and of course, we are all exhausted, we of course would like to have you arrive at a verdict". We make no suggestion that the remarks of the court were in and of themselves coercive. We do say, however, that setting the tone of possible prejudice at the outset when viewed with the struggle as to identification does not make for a fair and impartial determination in the early hours of the morning by an "exhausted" jury. After seven days of trial and many hours of deliberation the very least which should have been done at 12:35 A.M. when the jury announced its deadlock was to have permitted them to go to bed and resume their deliberations after securing some much needed rest. It was not until 3:47 A.M. that this jury, which had returned to the courtroom four times for assistance, found defendant guilty of two of the three counts of the indictment.

In our judgment the defendant was not accorded "a scrupulously fair and impartial trial where nothing should be done to prejudice his case or to obscure in the minds of the jurors the elemental question". (*People* v. *Becker,* 210 N. Y. 274, 289.) The record of this trial amply demonstrates that "the balanced judgment and fairness which our system of jurisprudence so properly demands" were destroyed by the combination of prejudicial events which occurred. (*People* v. *Dovico,* 6 A D 2d 457, 458 and cases cited therein.)

WILLIAMS, P. J., and HENRY, J., concur with DEL VECCHIO, J.; GOLDMAN and NOONAN, JJ., dissent in opinion.

Judgment affirmed.