Francis COX, Appellant,

v.

STATE of Alaska, Appellee.

No. 2862.

Supreme Court of Alaska.

Feb. 17, 1978.

Craig M. Cornish and R. Collin Middleton, Wagstaff and Middleton, Anchorage, for appellant.

Michael J. Keenan, Asst. Dist. Atty., Joseph D. Balfe, Dist. Atty., Anchorage, and Avrum M. Gross, Atty. Gen., Juneau, for appellee.

## OPINION

Before BOOCHEVER, Chief Justice, and RABINOWITZ, CONNOR and BURKE, Justices.

RABINOWITZ, Justice.

After trial by jury Francis Cox was found guilty of the crime of assault with intent to rape.[1] Subsequent to his indictment but prior to trial, Cox moved to suppress an anticipated in-court identification by a witness, Jonathan Ramey, on the ground that it was prejudicially tainted. That motion was denied, and the case proceeded to trial. Mistaken identity and alibi were Cox's main defenses. Shortly after the jury retired to commence their deliberations, they requested a playback of the court tape recording of two alibi witnesses' testimony. The trial court denied the request at that time. The record indicates that no communication by the court was made to either counsel or Francis Cox regarding the jury's request to listen to a playback of two alibi witnesses' testimony until after the verdict had been returned and filed. After Cox's trial counsel subsequently discovered the jury request and the trial court's communication to the jury, he submitted a motion for new trial, based in part on these events. The motion was denied and Cox was then sentenced to the maximum penalty, 15 years imprisonment, to be served consecutively to a prior sentence in Kentucky on which Cox had been paroled. This appeal followed.

We first address the issue whether the superior court's ex parte communication to the jury made in response to their request for playback of testimony constituted reversible error. In his affidavit filed in support of Cox's motion for a new trial, Cox's trial counsel asserted that subsequent to the return of the verdict he was informed by a juror

> that the jury had requested a playback of portions of the testimony of Mrs. Charita Riggins and Miss Jean Hehnlin, two witnesses whose testimony had supported the defendant's alibi. [The juror] indicated that the jury had specifically requested this testimony for the purpose of ascertaining the exact times that these persons said they had encountered the defendant during the afternoon in which the alleged crime had taken place.

---

1. AS 11.15.160 provides:

   A person who assaults another with intent to kill, or to commit rape or robbery upon the person assaulted, is punishable by imprisonment in the penitentiary for not more than 15 years nor less than one year.

In further support of the motion for new trial, Cox filed an affidavit from the bailiff who had charge of the jury. In this affidavit the bailiff stated that the jury retired to begin its deliberations at about 5 p.m. and approximately one hour later, the foreman of the jury informed him

> that they had a request, and wished to listen to the recorded testimony of two of the defendant's witnesses: Mrs. Charita Riggins, and Mrs. Jean Hehnlin. The foreman noted that the jury was concerned about the various times which these people had referred to in their testimony.
>
> I conveyed this request to Judge Carlson. . . . [H]e instructed me to reply that the jury would not be allowed to listen to the tapes at that time, but could renew their request later in the evening if necessary.

Judge Carlson filed an affidavit in response to the motion for new trial. In this affidavit Judge Carlson noted that the bailiff had made reservations for the jurors to dine at 7 p.m. and at 6:30 p.m., while at home, he received a call from the bailiff who informed him that the jury wanted to listen to the tape of two witnesses' testimony. Judge Carlson further averred that he informed the bailiff "to tell the jury that they could not hear the testimony at that time and if they still wanted to hear it after they returned from dinner they should renew their request." [2] In denying the motion for new trial, the superior court ruled, in part:

> I also find that the law does not require that I notify counsel, defendant—and the defendant of every instance when the bailiff communicates something to me concerning the jury and especially in a— case of this nature where the opportunity to again request for the hearing of the

tape was given, they did not request it. They came in with a verdict shortly after returning from dinner.

Cox raises two basic issues with respect to the superior court's actions concerning the jury's playback request. First, he argues that the denial of the request was reversible error. Second, Cox argues that even if the superior court's denial was proper, in the circumstances the superior court's actions denied him his right to be present at every stage of trial.

■ Jury requests for testimony playback are addressed to the sound discretion of the trial court.[3] Nevertheless, we have stated that "justice is more likely to be prompted than obstructed if the jury at its request is allowed to rehear the electronic recording of specific testimony given at trial." [4] Although resolution of the issue whether the superior court's denial of the jury's request for playback constituted an abuse of discretion presents an extremely difficult question, we find it unnecessary to decide this issue in light of our conclusion that Cox was denied the right to be present at every stage of the trial.

This court dealt with the subject of the defendant's presence in our recent opinion in *State v. Hannagan,* 559 P.2d 1059 (Alaska 1977). In *Hannagan,* when the jury requested playback of the testimony of two witnesses, counsel for both the state and the defendant were called to the courthouse. Hannagan was not called, and the judge suggested delaying the proceedings until the next morning when Hannagan could be present. Hannagan's counsel attempted to waive his client's right to be present, and the tape was played to the jury. We held that the playback was a "stage of trial" requiring the presence of the defendant under Alaska Criminal Rule

**2.** In his affidavit Judge Carlson further stated:

Among my reasons for denying the jury's request to hear the tape of certain witnesses' testimony was the fact that the jury had only been deliberating for less than one and one-half hours, the trial only lasted three and one-half days and the witnesses whose testimony was requested had testified within twenty-eight

hours of the time of the request, and the jury were scheduled to go to dinner shortly.

**3.** *Price v. State,* 437 P.2d 330, 334 (Alaska 1968).

**4.** *Id. See also* ABA Standards, Trial by Jury § 5.2, and Commentary at 134–38 (Approved Draft 1968).

38(a)[5] and that the purported waiver was ineffective. Though finding error, we did not reverse the conviction, because we found the error to have been harmless beyond a reasonable doubt. The effect of *Hannagan* was to extend to the jury deliberation—playback stage—the holdings of *Gafford v. State,* 440 P.2d 405, 417 (Alaska 1968), and *Noffke v. State,* 422 P.2d 102, 105 (Alaska 1967), that "a defendant has a right to be present when any type of communication occurs between the court and the jury during its deliberations."[6]

In *Noffke v. State,* 422 P.2d 102 (Alaska 1967), after the jury had retired, some of the jurors requested additional instructions from the court. The bailiff delivered the request to the judge who, without contacting counsel or the defendant and without reconvening court, issued supplemental instructions. We concluded it was error for the superior court to communicate with the jury in the absence of Noffke and his attorney. However, we refused to adopt a per se reversibility standard in such situations but held the error must affect a substantial right of the defendant.[7] The appropriate standard, as pointed out in *Hannagan,*[8] is now the "harmless beyond a reasonable doubt" standard of *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

In *Gafford v. State,* 440 P.2d 405 (Alaska 1968), the judge and jury exchanged notes relating to the clearing of the courtroom when the verdict was to be received. The jury's request to clear the courtroom was based on an emotional outburst the first time the verdict was received and the jury was polled. We did not reverse because the

defendant's substantial rights were not affected. Noting that "unlike the communication involved in *Noffke* [the note] had no direct bearing on the merits of the litigation."[9]

We have concluded, in light of the factual context of this case and under the *Noffke-Gafford-Hannagan* rationale, that the superior court's ex parte communication in this case constituted error. As we stated in *Hannagan,* "it [is] constitutional error for the judge to communicate with the jury or permit the playback of testimony to the jury in the defendant's absence."[10] Therefore, it must be determined whether the superior court's error was harmless beyond a reasonable doubt.

In the case at bar, the superior court's response, transmitted through the bailiff, related directly to the issue of whether the jury's playback request would be honored. Since no electronic recording was made of the trial court's communication to the jury, through the bailiff, we have no way of ascertaining precisely what was communicated to the jury by the bailiff. Thus, the possibility cannot lightly be dismissed that the superior court's response may have implied—even unintentionally—to the jury that they need not listen to the playback of the witnesses' testimony. Based upon the affidavits to which we have previously alluded, the trial court's response to the jury's request was equivocal—even when viewed in its most favorable light.

Further, the recorded evidence which the jury sought to have played—testimony of two alibi witnesses—was crucial to Cox's defense; of particular importance was their testimony as to the times involved.[11] In the

---

5. Criminal Rule 38(a) provides:
   The defendant shall be present at the arraignment, at the preliminary hearing, at the time of plea, at the omnibus hearing, and at every stage of the trial, including the impaneling of the jury and return of the verdict, and at the imposition of sentence, except as otherwise provided in this rule.

6. *Hannagan,* 559 P.2d at 1064.

7. 422 P.2d at 105.

8. 559 P.2d at 1065.

9. 440 P.2d at 417.

10. *State v. Hannagan,* 559 P.2d 1059, 1065 (Alaska 1977).

11. In this regard appellant has argued, in part:
    In this case, the prejudice is manifest. It is not predicated upon mere legal technicalities. The defendant presented two witnesses who, in effect, established defendant could not have been where he was alleged to have committed the offense. . . . If the jury believed the witnesses, it is likely they would have acquit-

words of appellant, "No other testimony presented by [him] during the trial was a[s] crucial to his defense. If believed, the jury must have acquitted. No person can be at two places at the same time." Had Cox and his attorney been made aware of the request, the superior court might have determined that the playback was more important than the jurors' dinner plans. It is even more likely that counsel or Cox could have had sufficient input to persuade the superior court to allow the playback without renewed request. At the very least, Cox and his attorney would have had the opportunity to help formulate the wording of the court's response to the jury. We thus conclude that the superior court's ex parte communication to the jury, in violation of Cox's rights under Criminal Rule 38(a), cannot be considered harmless error beyond a reasonable doubt. Therefore, the matter must be remanded for a new trial.

One additional issue requires resolution in this appeal. Appellant has further specified as error the superior court's admission into evidence of Ramey's in-court identification on the ground that the witness' testimony was based on pretrial identifications which were manifestly unfair. Disposition of this issue requires that the relevant facts be related in some detail.

The victim of appellant's alleged assault with intent to rape was H.B., a 14-year-old girl. H.B. was a student who had been participating on the Anchorage West High School swim team.[12]

Jonathan Ramey, the swimming coach at West High, testified that a few minutes before the assault on H.B., while coaching his swim team work-out, he saw a man standing in the vicinity of the pool. Ramey observed the man for 15 seconds, at the most, at a distance of 60–65 feet. He described the person to the police as about 6 foot tall, had thin legs and either—either heavy shoulders or a heavy top on, that the color I remember was orange, that I don't—didn't know whether it was a coat or whether it was a big sweater or what, it was orange; that he had the beginnings of a beard or a pock-marked face and had a short afro haircut and was black.

Two days later, Cox was attending a gymnastics meet at West High. George Walker, an assistant principal, then noticed that Cox resembled the description given by H.B. He contacted H.B. and arranged for her to walk by Cox in order to make identification. When H.B. indicated that Cox was the man who had assaulted her, Walker and a security guard put Cox under citizen's arrest and detained him in an office until the arrival of the police.

One of the principals of West High went to the pool and told Ramey they had apprehended the individual who was involved in the incident and requested Ramey to go to the office to identify him. Ramey testified that on the way to the office he expected to see the person who had assaulted H.B. The principal went inside the office while Ramey waited in the hallway. Ramey was told that they did not want him to go in, and an officer came out and began interviewing Ramey about the incident. As this interview was occurring, Cox was brought out of the office, in handcuffs, and escorted to a police vehicle.

Ramey testified that he had no difficulty recognizing Cox as the man who had been at the pool two days earlier. He stated that he did not directly see the front of Cox's face, but rather basically a profile. Cox testified that he looked at Ramey directly in the face. According to Ramey, they were approximately 8 to 10 feet apart

ted. Obviously the jury had some doubt as to whether the defendant was actually where the State alleged that he was at 3:00 p.m. on November 24th. Why else would they have requested a playback of that particular testimony? Yet the trial court not only denied them an opportunity to re-listen to this testimony, but did so without even notifying the appellant or his counsel of the jury's request. Had the appellant and his counsel been present, they might have persuaded the judge to produce the tapes for the jury.

12. While H.B. was changing into her swimsuit on November 24, 1975, in the public locker room at West High, the alleged assault with intent to commit rape upon her occurred.

at the time. Ramey subsequently was taken to the police station and was shown a photo lineup of 20 individuals. He identified Cox's picture as that of the man at the pool.

Prior to trial, Cox moved to suppress the anticipated in-court identification of Cox by Ramey on the ground that it was so prejudicially tainted as to constitute a denial of due process. The argument was that the meeting in the hall so tainted the subsequent identifications that evidence of identification should not be admitted. An evidentiary hearing was held, at the close of which the superior court denied the motion.

In *Kimble v. State,* 539 P.2d 73 (Alaska 1975), we had occasion to discuss the issue of pretrial contacts in the context of subsequent in-court identification issues. There, one Bernhardt, the victim of armed robbery, and Kimble came into accidental contact several times before the in-court identification. The first contact occurred when Bernhardt was in the trooper's office picking up a subpoena. Bernhardt and a trooper were talking about a matter unrelated to the robbery when Kimble and another prisoner were brought into the room and placed in a holding cell. The trooper testified that Bernhardt identified Kimble as the man who had committed the robbery.[13] Neither Bernhardt nor the trooper knew Kimble's name at that time or that he was in the trooper's office because of the robbery of Bernhardt. Bernhardt also saw Kimble entering the elevator in the courthouse and recognized him as the robber. Later that same day as Bernhardt was sitting in a courtroom,[14] he observed Kimble for 15–30 minutes sitting in an area reserved for persons waiting to be arraigned.

After examining the relevant case law on the effect of suggestive pretrial contacts on in-court identifications, we stated:

In examining the facts in this case, however, we note at the outset that it differs from the cases cited *supra* in that those cases involved confrontation arranged by the police or prosecuting authority for the purpose of affording opportunity for a pretrial identification of the defendant. In this case, on the other hand, the confrontations were accidental in the sense that the State at no time appears to have intended Bernhardt to view Kimble for the purpose of making an identification. Nor do we believe that the State deliberately attempted to influence Bernhardt's memory of the robbery by exposing Kimble to him. To extend the *Wade-Stovall*[15] line of cases to purely accidental pretrial confrontations would place too great a burden on police and prosecutors to isolate witnesses and defendants. We hold, therefore, that when a pretrial confrontation is purely accidental and is not prearranged by the State, we will not ordinarily inquire into whether a denial of due process is the result.[16]

In *Kimble* we went on to note that an accidental sighting may be the subject of cross-examination, but the question is one of weight rather than admissibility.

The initial question, then, is whether the pretrial contacts in the case at bar were accidental. Cox argues that the contacts cannot be regarded as accidental because the actions of the principal who called Ramey to the office must be attributed to the state. The state counters with the argument that "school officials are not government agents for purposes of being subject to the constitutional limitations of police officers." Had the police requested that Ramey come to the office to identify Cox and the encounter in the hall had ensued, the *Kimble* rule for accidental pretrial contacts would not apply because the police are

---

**13.** Kimble had been arrested soon after the robbery on that charge.

**14.** Bernhardt had been subpoenaed to testify at the preliminary hearing of another defendant charged with the robbery.

**15.** *United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); *Stovall v. Denno,* 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967).

**16.** 539 P.2d at 77 (footnote omitted).

charged with the duty of ensuring that no such accidental encounters take place.

The problem of constitutional limitations on state agents other than the police has arisen often. In *Bell v. State,* 519 P.2d 804, 807–08 (Alaska 1974), this court held that an airport security officer employed by the State Department of Public Works was subject to fourth amendment limitations. The *Bell* test centers on "the nature of the duties performed and the part the officer may have played in the course of events leading to [the] arrest . . . ."[17] The *Bell* test was applied in *J.M.A. v. State,* 542 P.2d 170, 174–75 (Alaska 1975), to a situation involving a search by a foster parent. *J.M.A.* noted that "[foster parents] are no more responsible for the detection of criminal activity or the apprehension of those participating in such activity than would be any other private citizen."[18] Thus, this court held that foster parents are not agents of the state for purposes of the fourth amendment.[19]

As we analyze this case we think it is factually closer to *J.M.A.* than to *Bell.* Nevertheless, we think the merits of Cox's due process claims should be addressed. We believe there is sufficient doubt as to the "accidental" quality of the questioned confrontation to distinguish the instant case from *Kimble.* It is apparent that the factual context of the case at bar goes beyond the accidental sightings in *Kimble* but yet does not reach the level of planned action in the showup of *Stovall v. Denno,* 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), and *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972).

The danger which the courts have seen in these matters is the possible suggestion by the police of the suspect's identity prior to identification by the witness.[20] Unlike the situation in *Kimble,* this possibility is present in the case at bar. In *Kimble,* the witness had not been told that the person brought into the troopers' office was the robbery suspect; here Ramey testified that he had been told the subject had been apprehended and, further, that he expected to see the man whom he had previously seen at the pool.[21]

We thus think it appropriate to address the question whether Cox was denied due process by the trial court's admission into evidence of Ramey's in-court identification. The United States Supreme Court noted in *Neil v. Biggers,* 409 U.S. 188, 198, 93 S.Ct. 375, 381, 34 L.Ed.2d 401, 410–11 (1972), that it is the likelihood of misidentification which violates a defendant's right to due process. The Supreme Court went on to state:

> Suggestive confrontations are disapproved because they increase the likelihood of misidentification, and unnecessarily suggestive ones are condemned for the further reason that the increased chance of misidentification is gratuitous. But as *Stovall* makes clear, the admission of evi-

---

17. 519 P.2d at 808.

18. 542 P.2d at 176.

19. *See also Stange v. State,* 559 P.2d 650 (Alaska 1977); *State v. Stump,* 547 P.2d 305 (Alaska 1976). There are cases holding school officials to fourth amendment standards, but usually the exclusionary rule is not applied. *See, e.g., Morale v. Grigel,* 422 F.Supp. 988, 996–1001 (D.N.H.1976); *State v. Young,* 234 Ga. 488, 216 S.E.2d 586, 591, *cert. denied,* 423 U.S. 1039, 96 S.Ct. 576, 46 L.Ed.2d 413 (1975).

20. *See Buchanan v. State,* 554 P.2d 1153, 1159 (Alaska 1976).

21. In *Kimble,* we were concerned that an application of the *Wade-Stovall* rules to accidental confrontation would place too great a burden on police and prosecutors to isolate witnesses and defendants. Nevertheless, we admonished the state to use greater diligence in guarding against the type of confrontation that occurred at the preliminary hearing. In our view, the confrontation in the case at bar could have been easily avoided by the police. At the time Cox was escorted out of the office, the second policeman was interviewing Ramey. It would not be too great a burden to require the police and prosecutors to prevent such situations. The second officer could reasonably be expected to know that Cox would be taken out of the office. The officer with Cox presumably knew that an identification witness was outside; it is not unreasonable to require him to ensure that a pre-trial confrontation did not occur.

dence of a showup without more does not violate due process.[22]

However, the Court articulated the central question as "whether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive."[23] The court set out the following considerations:

The opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.[24]

In *McCracken v. State*, 521 P.2d 499 (Alaska 1974), this court addressed the problem of due process in pretrial contacts. There we employed the standard of *United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), to judge the legitimacy of in-court identifications based, in part, on improper prior identifications. The test is whether the in-court identification had a source independent from the tainted confrontation. Factors to be considered, similar to those involved in the *Biggers* test, include:

The prior opportunity to observe the alleged criminal act, the existence of any discrepancy between any prelineup description and the defendant's actual description, any identification prior to lineup of another person, the identification by picture of the defendant prior to the lineup, failure to identify the defendant on a prior occasion, and the lapse of time between the alleged act and the lineup identification.[25]

Thus, there are two basic questions to be answered. First, a determination must be made whether the contact in the hall between Cox and Ramey was impermissibly suggestive. Second, a determination must be made as to the admissibility of any subsequent identification.

Assuming that the confrontation in the hallway between Cox and Ramey was impermissibly suggestive, we are of the view that Ramey's identification was reliable and that his in-court identification had a source independent from the tainted confrontation.[26] We therefore conclude that the superior court's admission of Ramey's in-court identification testimony did not constitute a denial of due process.[27]

---

**22.** 409 U.S. at 198, 93 S.Ct. at 382, 34 L.Ed.2d at 411 (italics supplied).

*Stovall v. Denno*, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), involved a show up of a suspect at a victim's hospital room prior to life-saving surgery. The Court upheld the procedure against a constitutionally based challenge, relying primarily on the exigent circumstances present in the case.

**23.** 409 U.S. at 199, 93 S.Ct. at 382, 34 L.Ed.2d at 411.

**24.** *Id.*

**25.** 388 U.S. at 241, 87 S.Ct. at 1940, 18 L.Ed.2d at 1165.

**26.** We attach significance to the length of time Ramey observed Cox, the distance involved, and the fact that Ramey's description did not vary greatly from Cox's actual physical characteristics.

**27.** In his reply brief, Cox has presented another issue relating to Ramey's in-court identification, *i. e.*, the right to counsel at a post-indictment photo lineup. This issue was not addressed in the appellant's opening brief. The point was not raised in appellant's statement of points on appeal. In the proceeding below, the objection was raised only as to the admission of the photos used in the photo lineup. Cox's counsel stated:

I'm going to object to their admission and I'm going to request a protective order excluding them on the grounds that they were presented to Mr. Ramey after the defendant's arrest and without counsel provided to him. There was no notification to me or anybody else in our office at that time and I think he did have a right for counsel to be present at that photo lineup to make sure that the photos were presented in as unprejudicial a manner as possible and just to simply observe the procedures by which they were exhibited.

Since the photographs were not admitted at trial and since the rule in *Kimble v. State*, 539 P.2d 73, 79 (Alaska 1975), is that there is no right to counsel at post-indictment photographic lineups, we have decided not to address this issue. *See also United States v. Ash*, 413 U.S. 300, 93 S.Ct. 2568, 37 L.Ed.2d 619 (1973). Appellate Rule 9(e) states, in part, that "[t]he court will consider nothing but the points so stated." *See, e. g., Moran v. Holman*, 501 P.2d 769, 770 n.1 (Alaska 1972); *see also Burford v. State*, 515 P.2d 382, 383 (Alaska 1973); *Miller*

The case is remanded for new trial upon the assault with intent to commit rape charge.[28]

BURKE, Justice, with whom BOOCHEVER, Chief Justice, joins, dissenting in part, concurring in part.

I agree that reversal is required in this case. However, I would base that reversal on Judge Carlson's refusal to permit further cross-examination of H.B., the alleged victim, rather than upon his communication to the jury following its request for a playback.

Judge Carlson did not refuse to allow the playback. He simply informed the jury, through his bailiff, that the matter of a playback would be postponed until after the jury had had its dinner. According to Judge Carlson's affidavit, he instructed the bailiff "to tell the jury that they could not hear the testimony at that time and if they still wanted to hear it after they returned from dinner they should renew their request." The affidavit of Scott Reeves, the bailiff, states: "Judge Carlson instructed me to reply that the jury would not be allowed to listen to the tapes at that time, but could renew their request later in the evening if necessary." Such action, in my opinion, was entirely reasonable and did not amount to a "communication" of the sort requiring the presence of defendant and counsel, so as to be error under the circumstances. *Hannagan* and *Noffke* are clearly distinguishable from the case at bar. In *Hannagan* the court *allowed* a playback without the defendant present. In *Noffke* the court *gave* additional instructions to the jury without first advising counsel or the defendant. Neither case, in my opinion, supports the action that we now take. As I view the record the defendant's substantial rights were not affected. Therefore, reversal is not required. *Gafford v. State*, 440 P.2d 405 (Alaska 1968).

Despite my disagreement on the issue of the playback I do concur in the result. In my opinion, reversal is required because the trial court unduly limited appellant's right to cross-examine H.B., the alleged victim. H.B. testified on behalf of the state and was cross-examined by defense counsel. During his own case-in-chief, the defendant attempted to recall H.B. to elicit testimony as to the height of her assailant and her present estimate of the defendant's height. Upon objection by the state, defendant's counsel made an offer of proof to the effect that when H.B. testified before the grand jury, she described her assailant as being 5 feet 7 inches tall. During the state's case-in-chief George Walker testified that H.B. described her assailant to him as being at least 6 feet tall. Defense counsel stated that he had not known prior to Walker's testimony that H.B. had ever given information, other than to the grand jury, relating to the assailant's height in specific terms. Counsel stated:

> My purpose now is to call the witness as my own and as an adverse witness to find out how she did describe the defendant and to see if she—it would have been to see if she can describe the height of the defendant now.

The superior court ruled that he had "had ample opportunity to cross-examine the witness when she was on the witness stand earlier after she . . . testified during the state's case-in-chief."

The court's refusal to allow the examination of H.B., in my opinion, amounted to a denial of his Sixth Amendment right to confront the witnesses against him. The credibility of witnesses is of vital importance when a conviction is based on eyewitness identification. In *Noble v. State*, 552 P.2d 142, 144 (Alaska 1976), we said:

> We agree that convictions based solely on eyewitness identification can indeed be troublesome, and such cases demand scrupulous consideration of the demeanor and

*v. City of Fairbanks*, 509 P.2d 826, 829 (Alaska 1973).

**28.** Although our disposition of the first issue in this appeal requires a new trial, we note our agreement with Justice Burke's separate opin-

ion in which he concludes that the superior court's limitation on Cox's cross-examination of H.B. constituted a denial of his constitutional right to confrontation.

credibility of the state's witnesses by the trier of fact. However, many convictions of sexual assault are necessarily based on this type of evidence because of the nature of the crime.

The court's ruling prevented the defendant from further attacking the credibility of H.B. by impeachment, if she affirmed Walker's testimony, or of Walker, if she did not. The right of cross-examination is included in the constitutional guarantee of the right of an accused to confront the witnesses against him. *Davis v. Alaska*, 415 U.S. 308, 315–16, 94 S.Ct. 1105, 1109–1110, 39 L.Ed.2d 347, 353 (1974); *Evans v. State*, 550 P.2d 830, 836 (Alaska 1976). While that right is not absolute, and the trial court is vested with broad discretion in controlling the order of proof, the examination of witnesses, and the scope of cross-examination, I believe that the superior court's refusal to allow the recall of H.B. in this case was an abuse of that discretion.

On the identification issue, I concur.